UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARKETTA MESHIEL MAY

Case No. 16-12131

Paul D. Borman
United States District Judge

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Stephanie Dawkins Davis
United States Magistrate Judge

Defendant.

_____/

**REPORT AND RECOMMENDATION
CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkt. 14, 17)**

## I. PROCEDURAL HISTORY

### A.   Proceedings in this Court

On June 10, 2016, plaintiff filed the instant suit seeking judicial review of the Commissioner's decision disallowing social security disability benefits. (Dkt. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), District Judge Paul D. Borman referred this matter to the undersigned for the purpose of reviewing the Commissioner's decision denying plaintiff's claims. (Dkt. 3). This matter is before the Court on cross-motions for summary judgment. (Dkt. 14, 17). Plaintiff also filed a reply in support her motion for summary judgment. (Dkt. 21). The cross-motions are now ready for report and recommendation.

1

B.    Administrative Proceedings

Plaintiff filed the instant claims for a period of disability and disability

insurance benefits on March 16, 2007, alleging disability beginning October 22,

2004.  (Tr. 14).[1]  The claim was initially disapproved by the Commissioner on

September 10, 2007.  *Id*.  Plaintiff requested a hearing, and on November 5, 2009,

she appeared before ALJ Roy Roulhac who considered the case *de novo*.  *Id*.  In a

decision dated February 10, 2010, ALJ Roulhac found that plaintiff was not

disabled.  Plaintiff requested a review of this decision, which was granted by the

Appeals Council.  *Id*.; *see also* Tr. 85-87.  ALJ John J. Rabaut considered the

matter on remand.  On August 24, 2011, ALJ Rabaut found that plaintiff was not

disabled.  (Tr. 11-22).  The Appeals Council denied plaintiff's request for review.

(Tr. 1-6).  Plaintiff appealed to this Court and successfully obtained a remand for

further review.  (Tr. 752-782).

After the decision from the District Court, the Appeals Council remanded

this matter to a third ALJ, Carol Guyton.  (Tr. 642, 785).  ALJ Guyton held a

hearing on January 22, 2016, during which Dr. Lorber, a medical expert testified

to assist ALJ Guyton.  (Tr. 661-732).  On November 10, 2016, ALJ Guyton issued

a partially favorable decision, concluding that plaintiff met Listing 1.04A until

---

[1] The Transcript of Social Security Proceedings is cited to throughout this Report and Recommendation as "Tr.," and found at Docket Entry 7.

2

September 1, 2007, when she showed medical improvement and no longer met the

Listing.  (Tr. 637-652).  Plaintiff did not object to the award of benefits and the

Appeals Council did not review the ALJ's determination on its own.  (Dkt. 14, Pg

ID 1173).  Plaintiff then filed the instant lawsuit.

For the reasons set forth below, the undersigned **RECOMMENDS** that

plaintiff's motion for summary judgment be **GRANTED**, that defendant's motion

for summary judgment be **DENIED**, that the findings of the Commissioner be

**REVERSED**, and that this matter be **REMANDED**.

## II.    FACTUAL BACKGROUND

Plaintiff was born in 1964 and was a younger individual on the disability

onset date and on the date the ALJ determined that she had medical improvement

and no longer met Listing 1.04A.  (Tr. 650).  Plaintiff was insured under the Social

Security Act through December 31, 2009.  (Tr. 645).  The ALJ applied the five-

step disability analysis to plaintiff's claim and found at step one that plaintiff had

not engaged in substantial gainful activity since the alleged onset date.  *Id*.  At step

two, from October 22, 2004 through September 1, 2007, the ALJ found that

plaintiff's degenerative disc disease of the lumber spine, status-post lumbar

laminectomy and fusion, and obesity were severe impairments.  (Tr. 646).  At step

three, the ALJ found that from October 22, 2004 through September 1, 2007,

plaintiff's severe impairments met Listing 1.04A.  (Tr. 646-648).  Thus, the ALJ

determined that plaintiff was under a disability from the alleged onset date through September 1, 2007.  (Tr. 648).

Beginning on September 2, 2007, the ALJ found plaintiff's severe impairments were the same, but that plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listing as of that date because of medical improvement.  (Tr. 648-649).  The ALJ determined that plaintiff had the following residual functional capacity (RFC):

> After careful consideration of the entire record, the undersigned finds that, beginning September 2, 2007, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: the claimant could not stand, walk, or sit for more than 15 minutes at a time. She could occasionally stoop, crouch, balance or climb ramps or stairs. She could never crawl, kneel, or climb ladders, ropes, or scaffolds. She would require a handheld assistive device for prolonged ambulation or on uneven terrain. She should avoid hazardous machinery, unprotected heights, and fast moving hazards. She would be limited to simple, routine, repetitive tasks and simple work related decisions with few workplace changes and free of fast-paced production demands.

(Tr. 649).  At step four, the ALJ concluded that plaintiff could not perform past relevant work as a nurse assistant.  (Tr. 682).  At step five, the ALJ denied plaintiff benefits after September 1, 2007 because plaintiff could perform a significant number of jobs available in the national economy.  (Tr. 683).

## III.   DISCUSSION

### A.   Standard of Review

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive.  42 U.S.C. § 405(g).  Therefore, this Court may not reverse the

5

Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing *Mullen*, 800 F.2d at 545.

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed

to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at

241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545.  In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

B.      Analysis

1.      Listing 1.04A and Medical Improvement

Plaintiff asserts that the ALJ committed a number of errors, including the failure to give good reasons for the weight given to the treating physician opinions, and the failure to provide substantial evidence in support of the credibility assessment.  Plaintiff asserts that the ALJ also erred by relying on the opinion of a medical advisor for plaintiff's credibility and the credibility of plaintiff's treating physician opinions.  Finally, plaintiff asserts that the ALJ's determination of medical improvement on September 1, 2007 is not supported by substantial evidence.

As to plaintiff's last argument, she further explains that the standard for finding "medical improvement" is governed by 20 C.F.R. § 404.1594(f)(3) and (f)(4).  According to plaintiff, there are two questions posed: has there been medical improvement; and is the medical improvement related to the ability to

8

work?  The fact that medical improvement has occurred is not relevant unless it

has resulted in regaining the ability to work.  Consequently, plaintiff asserts that

the fact that medical improvement has occurred to the point that a claimant no

longer meets a Listing is not where the analysis stops.  According to plaintiff, the

underlying premise of ALJ Guyton's finding that plaintiff medically improved on

September 1, 2007, is that plaintiff no longer met Listing 1.04(A).  Plaintiff asserts

that the ALJ does not ask or explain how, if at all, that fact, relates to plaintiff's

ability to work.  Although the ALJ does not explicitly state that her opinion on

medical improvement rests heavily, if not solely, on Dr. Lorber's opinion

testimony, plaintiff says that Dr. Lorber's testimony is the only evidence that

supports ALJ Guyton's decision.

Plaintiff also points out that the only possible remaining support for the

ALJ's determination of medical improvement, on which the ALJ specifically

relies, is the report of Dr. Montasir.  According to plaintiff, the ALJ's analysis is

faulty in several respects, and rests more on debunking the plaintiff's and her

treating physicians' opinions than explaining how Dr. Montasir's report supports a

finding that plaintiff has regained the ability to work on September 1, 2007.

Although plaintiff acknowledges that objective findings may have improved with

surgery such that she no longer met Listing 1.0A, she maintains that there is not

substantial evidence supporting the ALJ's determination that plaintiff medically

recovered on September 1, 2007 to the extent she regained the ability to perform

sedentary work in competitive employment.

According to the Commissioner, there is some evidence—e.g., the

post-surgery imaging studies, Dr. Soo's April 2007 examination notes, and Dr.

Soo's and Dr. Lorber's medical opinions—to support a finding that plaintiff's

disability actually ended *before* Dr. Montasir's examination on September 1, 2007.

(Tr. 301-02, 306, 455-56, 489, 695-708).  However, the Commissioner says that

the ALJ reasonably chose that examination date as a point of reference because it

was the most comprehensive one in the record, and it served as objective evidence

that plaintiff no longer had the nerve-root compromise and persistent motor,

sensory, and reflex deficits that previously supported a favorable Listings analysis.

(Tr. 647-49).

The Commissioner urges the Court to reject plaintiff's "technical challenge"

to the ALJ's medical improvement analysis; that "[t]he ALJ does not ask or

explain how, if at all, that fact[] relates to plaintiff's ability to work."  (Dkt. 14 at

47).  According to the Commissioner, this argument is unavailing because the

controlling regulation presumes that medical improvement is related to plaintiff's

ability to work if the ALJ finds that "the severity of the prior impairment(s) no

longer meets or equals the same listing section used to make [the] most recent

favorable decision."  20 C.F.R. § 404.1594(c)(3)(i).  According to the relevant

10

provision, "[i]f there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to your ability to work." 20 C.F.R. § 404.1594(c)(3)(i). Thus, the Commissioner asserts that the ALJ sufficiently addressed the relationship between the medical improvement and plaintiff's ability to work when she wrote in her decision:  "The medical improvement that has occurred is related to the ability to work because the claimant no longer has an impairment or combination of impairments that meets or medically equals the severity of a listing."  (Tr. 648) (citing 20 C.F.R. § 1594(c)(3)(i)).  The Commissioner maintains, therefore, that there was no error.

While plaintiff says that she "may" not have met Listing 1.04A at some point after her surgery, the ALJ's analysis in this regard is not supported by substantial evidence.  To meet Listing 1.04A, a claimant must show that she has a disorder of the spine with:  "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04A.  It is well-settled that to "meet" a listing, a claimant's impairments must satisfy each and every element of the listing. *See Sullivan v. Zebley*, 493 U.S. 521,

530 (1990); *Blanton v. Soc. Sec. Admin.*, 118 Fed. Appx. 3, 6 (6th Cir. 2004).

As explained in *Thomas v. Comm'r of Soc. Sec.*, 2017 WL 127509, *4 (W.D. Mich. 2017), there is no presumption of continuing disability. *Id.* (citing *Kennedy v. Astrue*, 247 Fed.Appx. 761, 764 (6th Cir. 2007)). Nevertheless, the burden of proof to establish that a claimant has experienced a medical improvement which renders her capable of performing substantial gainful activity lies with the Commissioner. *Thomas*, at *4 (citing *Kennedy*, 247 Fed. Appx. at 764-65; *Couch v. Comm'r of Soc. Sec.*, 2012 WL 394878, at *10 (S.D. Ohio, Feb. 7, 2012). Indeed, an ALJ must "build an accurate and logical bridge between the evidence and the result." *Thomas*, at *4 (quoting *York v. Massanari*, 155 F. Supp. 2d 973, 980 (N.D. Ill. 2001)); *see also Gross v. Comm'r of Soc. Sec.*, ——— F.Supp.3d ———, 2017 WL 1151099, at *4 (E.D. Mich. March 28, 2017) (Patti, M.J.) ( ALJ's decision "fails to provide an accurate and logical bridge between the evidence and the result.'") (citing *Pollaccia v. Comm'r of Soc. Sec.*, 2011 WL 281044, *6 (E.D. Mich. Jan. 6, 2011)); *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Here, in the view of the undersigned, the ALJ did not do so with respect to her Listing analysis.

The ALJ concluded that plaintiff met Listing 1.04(A) through September 1, 2007:

The medical record indicates the claimant met listing

12

1.04(A) from October 22, 2004 through September 1,
2007. The claimant treated with Michael White, M.D,
and Teck Mun Soo, M.D., for complaints of chronic back
pain following an October 2004 work injury. A
December 2004 magnetic resonance imaging (MRI) of
the claimants lumbar spine showed a large LS-Sl disc
herniation leading to effacement upon the thecal sac and
both S1 nerve root sleeves (Ex. 4F/14, 18, 56). The
claimant's back pain was initially treated with
medication, physical therapy, lumbar epidural steroid
injections. The claimant subsequently underwent a
fusion and laminectomy at L5-S1 in July 2006 after
conservative treatment failed to resolve her back pain.
(Ex. 1F/21 ). The claimant reported ongoing back pain
following her 2006 surgery. In February 2007, the
claimant reported her back pain was an 8 out of 10, with
0 being no pain and 10 requiring a trip to the emergency
department (Ex. 1F/36). On exam prior to September 1,
2007, the claimant presented with an antalgic gait, a
positive bilateral straight leg raise test, lower extremity
motor weakness, and lumbar tenderness. (Ex. 1F/36, 45,
117, 127). The undersigned finds the claimant met listing
1.04(A) from October 22, 2004 through September 1,
2007 because the diagnostic evidence and treatment
records during the relevant period shows degenerative
disc disease of the lumbar spine with nerve root
compromise and neuro-anatomic distribution of pain,
limitation of motion of the spine, motor loss (atrophy
with associated muscle weakness or muscle weakness)
accompanied by sensory or reflex loss, and positive
straight-leg raising test (sitting and supine).

(Tr. 647). As of September 2, 2017, the ALJ concluded that medical improvement

occurred such that plaintiff no longer met Listing 1.04A:

The medical evidence does not support listing-level
severity for any physical impairment. No acceptable
medical source has mentioned findings equivalent in

13

> severity to the criteria of any listed impairment, individually or in combination.
>
> Listing 1.04 is not met because the record does not demonstrate compromise of a nerve root (including the cauda equina) of the spinal cord with additional findings of: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, positive straight-leg raising or; B. Spinal arachnoiditis or; C. Lumbar spinal stenosis resulting in pseudoclaudication.

(Tr. 648).  The ALJ cited the following evidence in support of her conclusion of

medical improvement as of September 2, 2007:

> The objective medical evidence fails to provide strong support for the claimant's allegations of disabling symptoms and limitations after September 1, 2007. The claimant underwent a consultative examination performed by E. Montasir, M.D., on September 1, 2007. On exam, the claimant presented with a normal gait, excellent handgrip strength, full motor strength, and negative muscle atrophy. Dr. Montasir noted the claimant was able to get on and off the exam table without difficulty. Dr. Montasir did not issue any functional restrictions from physical impairments. (Ex. 13F). The claimant's reports of back pain after September 2007 were treated conservatively with medication and lumbar injections. The claimant's reports of ongoing severe back pain are inconsistent with musculoskeletal findings after September 2007.  On exam after September 2007, the claimant presented with full extremity strength and a normal gait (Ex. 15F/3, 20F/7, 8, 10, 11). In February 2010, the claimant reported her back [pain] was only a 5 out of 10 (Ex. 20F/28). In an April 2010 office treatment, the claimant

14

> reported her pain medication was helpful in treating her
> pain (Ex. 20F/25). In November 2014, the claimant again
> reported her medication was helpful in treating her pain
> (Ex. 21F/4).

(Tr. 649).  The lack of a logical bridge between the ALJ's conclusion of medical

improvement and the medical evidence cited by the ALJ is demonstrably evident

as detailed below.

The ALJ began her analysis of plaintiff's medical improvement by citing

report from E. Montasir, M.D., who performed the consultative examination on

plaintiff on September 1, 2007.  (Tr. 649, citing Tr. 582-589).  The ALJ pointed to

Dr. Montasir's observations that, on exam, plaintiff presented with a normal gait,

excellent handgrip strength, full motor strength, and negative muscle atrophy.  Dr.

Montasir also noted the claimant was able to get on and off the exam table without

difficulty.  The ALJ further observed that Dr. Montasir did not issue any

functional restrictions from physical impairments.  From this report, the ALJ then

identified post-September 1, 2007 evidence that is seemingly consistent with Dr.

Montasir's report in order to conclude that she no longer met the Listing as of this

date, which is discussed below.  Notably, a reviewing physician concluded, after

reviewing Dr. Montasir's report, that plaintiff could perform medium work.  (Tr.

590-97).  The ALJ rejected this opinion as totally out of line with plaintiff's

limitations.  (Tr. 650).  Thus, the significance of Dr. Montasir not issuing

15

restrictions is entirely unclear.  And, it does not appear that he was asked to do so.

Moreover, as discussed in more detail below, while Dr. Montasir found evidence

of positive straight leg raising, the ALJ concluded that, as of the date of Dr.

Montasir's examination, plaintiff no longer met the Listing.  (Tr. 583, 589).  This

is incongruent with the ALJ's conclusion that one of the reasons plaintiff met the

Listing before September 1, 2007 was positive straight leg raising results.

A comparison of the medical evidence the ALJ relied on in her Listing

analysis along with her medical improvement conclusion illustrates why the

decision that plaintiff does not meet the Listing as of September 1, 2007 is

unsupported by substantial evidence.  The first piece of medical evidence to

support the ALJ's finding that plaintiff met Listing 1.04A is a December 2004

MRI of the lumbar spine showing a large LS-Sl disc herniation leading to

effacement on the thecal sac and both S1 nerve root sleeves.  (Tr. 647, citing Tr.

468, Dr. Soo's surgery notes; Tr. 472, Dr. Soo's office notes dated 5/18/06; Tr.

510, 12/13/04 MRI).  Plaintiff had two subsequent MRIs of her spine, one on

February 28, 2007 (Tr. 319) and one on March 25, 2009 (Tr. 602).  The ALJ does

not mention the February, 28 2007 MRI in her Listing analysis, even though it was

performed during the time she determined plaintiff satisfied the Listing.  Notably,

Dr. Lorber, the testifying expert, opined that there was no change from the 2007

MRI to the 2009 MRI.  (Tr. 697).  Yet, the ALJ does not explain how plaintiff met

16

the Listing before September 1, 2007 but not after that date, when her MRIs from 2007 and 2009, though different from that performed in 2004, are essentially the same.

The next piece of medical evidence the ALJ cites in support of her conclusion that plaintiff met the Listing is that she underwent a fusion and laminectomy at L5-S1 in July 2006 after conservative treatment failed to resolve her back pain.  (Tr. 647, citing Tr. 301, Dr. Soo treatment note dated 4/19/07).  Obviously, nothing has changed about the fact of surgery that would affect the determination of plaintiff's medical improvement as of September 2, 2007.  And, while the record is replete with evidence that plaintiff's fusion was successful and stable, as discussed in considerable detail below, her symptoms, pain levels, clinical assessments, and treatments did not change after her surgery.  Indeed, she continued to be diagnosed with lumbar radiculopathy, she continued to receive spinal injections and pain medications, which were not working, and she was diagnosed with "failed back syndrome."  (Tr. 598, 600).

In finding that she met the Listing, the ALJ also relied on records showing that in February 2007, plaintiff reported her back pain was an 8 out of 10, with 0 being no pain and 10 requiring a trip to the emergency department.  (Tr. 647, citing Tr. 316, Dr. Kimpson treatment note dated 2/19/07).  In determining that she no longer met the Listing, the ALJ pointed to evidence that plaintiff's post-9/1/07

pain level was only 5 out of 10.  (Tr. 649, citing Tr. 1111, Dr. Kimpson note dated

2/12/10).  Yet, the plaintiff often reported pain at the 8 out of 10 (or higher) level

after September 1, 2007 – the same time frame on which the ALJ relied to

conclude that her pain significantly improved such that she no longer met the

Listing.  (Tr. 1109, 3/4/10, pain 10/10); (Tr. 1108, 4/1/10, pain 9/10); (Tr. 625,

6/24/10, pain 5-10/10); (Tr. 619, 9/21/10, pain 6-10/10); (Tr. 617, 11/16/10, pain

10/10); (Tr. 1092, 12/14/10, pain 5-10/10).  This level of pain continued to be

documented into 2011-2014.  (Tr. 1035-1091).  Additionally, plaintiff reported

pain levels as low as 5/10 during the covered period.   (Tr. 505, Dr. Coates

progress note dated 3/11/05, pain 6/10; Tr. 515, PT progress note dated 9/13/06,

pain 5/10; Dr. Kimpson progress note dated 2/19/07, pain level 5-10/10).

Similarly, the ALJ pointed to two office treatment notes from April 2010

and November 2014 wherein plaintiff indicated that her medication was helpful in

treating her pain.  (Tr. 649, citing Tr. 1108, 1036).  Yet, plaintiff made similar

observations in treatment records during the covered period as well as before April

2010 (the earliest date of record on which the ALJ relied), and also stated that

medications were not helping.  (Tr. 321, 12/13/06; Tr. 605, 10/29/09; Tr. 598,

3/9/09).  Thus, the evidence cited by the ALJ in this regard does not support

medical improvement such that plaintiff no longer meets the Listing as of

September 1, 2007.

The ALJ also relied on plaintiff's "conservative treatment" after September 2007, consisting of only medication and lumbar injections, to support her conclusion that plaintiff no longer met the Listing.  (Tr. 649).  Plaintiff's treatment of injections and medication was not effective in alleviating her symptoms before her surgery, and apparently remained largely ineffective after surgery.  Thus, it is not clear from the ALJ's analysis how continuing with such treatment after surgery suggests that she no longer met the Listing as of September 2, 2007.  Indeed, as plaintiff's long term treating pain specialist made clear in April 2010, she suffers from intractable pain despite surgery, epidural steroid injections, physical therapy, and medications.  (Tr. 607).  While there is a suggestion that her physicians were considering the option of a spinal cord stimulator (further evidencing ongoing intractable pain), the pain specialist's treatment records strongly indicate that plaintiff had reached maximum medical improvement.  *Id*; *see also* Tr. 1115 (Dr. Kimpson note dated 7/15/15).  And, the various treatment modalities previously employed were apparently not effective.  (Tr. 598, Dr. Emmer, neurologist treatment note, 3/9/09, indicating that Dr. Soo recommended no further surgery, epidural steroid injections did not help, and change in medications not working).

In her discussion that plaintiff met the Listing before September 1, 2007, the ALJ relied on evidence that, during plaintiff's pre-September 1, 2007 examinations, plaintiff presented with an antalgic gait, a positive bilateral straight

19

leg raising test, lower extremity motor weakness, and lumbar tenderness.  (Tr. 316, Dr. Kimpson treatment note dated 2/19/07; Tr. 325, Dr. Claybrooks treatment note dated 5/18/06; Tr. 397, Dr. White treatment note dated 2/5/05; Tr. 407, Dr. White treatment note dated 1/6/05).  The ALJ found that the plaintiff's reports of ongoing severe back pain were inconsistent with "musculoskeletal findings" after September 1, 2007.  In support of this conclusion, the ALJ pointed out that, on exam after September 1, 2007, plaintiff presented with full extremity strength and a normal gait.  (Tr. 649, citing Tr. 600, treating note of Dr. Emmer dated 3/9/09; Tr. 614, treating note of Dr. Ajlouni dated 2/17/11; Tr. 615, treating note of Dr. Ajlouni dated 1/20/11; Tr. 617, treating note of Dr. Kirouac dated 10/16/10; Tr. 618, treating note of Dr. Ajlouni dated 10/19/10).

Plaintiff's antalgic gait problems were definitely apparent before her surgery and in the months afterward.  (Tr. 397, Dr. White progress note 2/5/05, antalgic gait pattern; Tr. 407, Dr. White progress note 1/6/05, antalgic gait; Tr. 325, Dr. Claybrooks treatment note, 7/25/06, antalgic gait, used walker).  Later in 2007, but during the covered period, plaintiff's gait had improved.  (Tr. 559, 2/19/07 Dr. Kimpson notes, "gait is ok").  After September 1, 2007, plaintiff's gait continued to be mostly normal, although sometimes observed to be slow and she sometimes used a cane.  (Tr. 633, Dr. Ajlouni treatment note 3/4/10, steady gait; Tr. 617, treatment note Dr. Kirouac dated 11/16/10, steady gait; Tr. 1092, Dr. Ajlouni

treatment note dated 12/14/10, gait within normal limits; Tr. 1108, Dr. Kirouac

treatment note dated 4/1/10, gait slow; Tr. 1047, Dr. Kirouac treatment noted

dated 11/5/13, appropriate gait; Tr. 1051, Dr. Kirouac treatment note dated

7/16/13, gait within normal limits; Tr. 1058, Dr. Kirouac treatment note dated

11/13/12, gait slow but steady; Tr. 1059, treatment note Dr. Traylor dated

10/16/12, slow gait, using cane; Tr. 1074, treatment note Dr. Ajlouni dated 8/9/11,

gait slow, using cane).  Thus, the ALJ's observations that plaintiff had a normal

gait as of September 1, 2007 appears to place a gloss on the medical findings and

does not support a finding of medical improvement, given that her gait was

deemed, at best, "ok" during the covered period.

There simply does not appear to be any significant difference in the medical

records regarding plaintiff's "musculoskeletal findings" before and after

September 1, 2007, despite the ALJ's conclusion.  In concluding that such

findings showed medical improvement as of September 1, 2007, the ALJ pointed

to the March 2009 report of Dr. Emmer, in which he noted normal muscle strength

and tone.  (Tr. 600).  The ALJ also pointed to:  (1) a progress note from Dr.

Ajlouni dated 2/17/11, which does not note plaintiff's strength and muscle tone;

(2) a progress note from Dr. Ajlouni dated 1/20/11 where he noted that plaintiff's

strength was intact; (3) a progress note from Dr. Kirouac dated 11/16/10, which

does not mention muscle strength and tone; and (4) a progress note dated 10/19/10

from Dr. Ajlouni, which does not mention muscle strength and tone.  (Tr. 614, 615, 617, 618).  Yet, these medical findings are indistinguishable from those made during the covered period.  Indeed, plaintiff's muscle strength was typically 5/5 in all categories before September 1, 2007, when the ALJ concluded that she met the Listing.  (Tr. 306, Dr. Soo progress note dated 3/15/07; Tr. 301, Dr. Soo progress note dated 4/19/07; Tr. 337, Dr. Soo progress note 5/18/06); (*see also* Tr. 322, Dr. Kimpson progress note dated 10/13/06, "strength is intact in the bilateral lower extremities").  Thus, there does not appear to be a foundation in the medical records to support the ALJ's decision that plaintiff's musculoskeletal findings improved to such a degree that she no longer met the Listing as of September 2, 2007.

Similarly, there was significant evidence of bilateral positive straight leg raising both before and after September 1, 2007.  The ALJ relied on positive straight leg raising results to conclude that plaintiff met the Listing before September 1, 2007, but did not explain why she reached a different result as of that date despite plaintiff: (1) having evidence of both positive and negative straight leg raising before 9/1/07[2]; and (2) having positive straight leg raising

---

[2] *See e.g.*, (Tr. 306, Dr. Soo progress note dated 3/15/07, negative straight leg raising; Tr. 301, Dr. Soo progress note dated 4/19/07, negative straight leg raising; Tr. 316, Dr. Kimpson progress note dated 2/19/07, + straight leg raising bilaterally in seated position; Tr. 322, Dr. Kimpson progress note dated 12/13/06, straight leg raising + on right seated).

results after 9/1/07; and (3) as mentioned above, having positive straight leg

raising at the Dr. Montasir examination.  (Tr. 599, Dr. Emmer progress note dated

3/9/09, + straight leg raising bilaterally; Tr. 635, Dr. Kirouac progress note dated

2/19/10, bilateral + straight leg raising, seated, greater on right; Tr. 632, Dr.

Kirouac progress note dated 4/1/10, bilateral + straight raising seated; Tr. 618, Dr.

Ajlouni progress note dated 10/19/10, bilateral + straight leg raising).

Next, the ALJ relied on evidence of muscle weakness to conclude that

plaintiff met the Listing before September 1, 2007, but does not explain how the

evidence of muscle weakness changed as of that date.  Plaintiff reported weakness

both before and after September 1, 2007.  (Tr. 316, Dr. Kimpson progress note

dated 2/19/07; Tr. 321, Dr. Kimpson progress note dated 12/13/06; Tr. 631, Dr.

Kimpson progress note dated 4/9/10; Tr. 619, progress note dated 9/21/10; Tr.

617, Dr. Kirouac progress note dated 11/16/10).  The same is true for the "lumbar

tenderness" the ALJ pointed to in finding that plaintiff met Listing 1.04A.  It is

also present after September 1, 2007.  (Tr. 1074, Dr. Ajlouni progress note dated

8/9/11).

While the Sixth Circuit has emphasized that ALJ's are not subject to a

"heightened articulation standard" in considering the listing impairments, *Bledsoe*

*v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. 2006), as noted above, the burden

of proof of medical improvement lies with the Commissioner.  *Kennedy*, 247 Fed.

App. at 765.  Consequently, the ALJ's written decision must make the reasons for her decision sufficiently clear.  *See Waller v. Astrue*, 2012 WL 6771844, at *3 (N.D. Ohio Dec.7, 2012), adopted by 2013 WL 57046 (N.D. Ohio Jan. 3, 2013). Here, the ALJ simply did not "build an accurate and logical bridge between the evidence and the result."  *Thomas*, at *4.  Because the ALJ's stated rationale to support her conclusion that plaintiff's medical improvement negated her meeting of the Listing, the decision to deny benefits beyond September 1, 2007 is unsupported by substantial evidence.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, a plaintiff can be awarded benefits only if proof of her disability is "compelling."  *Lumm v. Comm'r of Soc. Sec.*, 2014 WL 5149751, at *16 (W.D. Mich. Oct. 14, 2014) (citing *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling).  Here, the undersigned suggests that this matter must be remanded for the payment of benefits from September 2, 2007 forward because there is no substantial evidence to support the ALJ's conclusion that plaintiff no longer met Listing 1.04A.  In other words, the Commissioner did not satisfy her burden of establishing medical improvement such that plaintiff is only entitled to a closed period of benefits.  As a result,

24

plaintiff is entitled to continuing benefits because she suffers from a listed impairment entitling her to disability benefits.

### 2. Treating Physician Opinions

Given the foregoing conclusions regarding the Listing, the remainder of plaintiff's objections to the ALJ's decision need not be addressed. *See Lawson v. Astrue*, 695 F.Supp.2d 729, 747 (S.D. Ohio 2010). However, because this matter was previously remanded by the Court for a re-assessment of the treating physician opinions, the undersigned will review that issue for the sake of completeness.

### (a). Legal Standards

The opinion of a treating physician should be given controlling weight if it is: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

25

Once an ALJ has determined that a treating source opinion is not entitled to controlling weight, the ALJ must apply specific factors to resolve the question of what weight will be assessed.  Those factors include, (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, and (5) the specialization of the treating source.  *Id.; see also Wilson,* 378 F.3d at 544.  Failure to analyze a treating source opinion under the two-prong controlling weight test amounts to the failure to provide good reasons for giving that opinion less than controlling weight.

*Gayheart* at 376-77.

> This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ] he is not. Significantly, the requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule."

*Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citations omitted).  "This circuit 'has made clear that [it] do[es] not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion.'"  *Gayheart,* 710 F.3d at 380 (quoting *Cole*, 661 F. 3d at 939).

(b).   Dr. Kimpson

In April 2010 and January 2015, Jeffery Kimpson, M.D., issued medical source statements opining that plaintiff was unable to work since December 2004 and she was permanently disabled.  The ALJ gave little weight to Dr. Kimpson's assessments because the ultimate decision of disability is an issue reserved to the Commissioner under SSR 96-5p.  (Tr. 649).

According to plaintiff, ALJ Guyton does not discuss Dr. Kimpson's opinions in any context whatsoever; rather, she simply rejects them because the "ultimate determination of disability…reserved to the Commissioner."  (Tr. 649). Plaintiff maintains that this analysis falls far short of the task set by the Court in the order remanding this matter.  Plaintiff contends that the ALJ's rationale for disregarding treating source opinions in this case, not only fails to fulfill the task set by this Court, but also contravenes the "treating physician" rule.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (The controlling "treating physician" rule requires that "substantial deference – and if the opinion is uncontradicted, complete deference – must be given to such opinions and diagnoses.").  Plaintiff argues that the ALJ violated the treating physician rule because the only reason she gave for discounting Dr. Kimpson's opinion was that "the ultimate decision of disability is reserved to the Commissioner."  Plaintiff maintains that this reasoning is insufficient under *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. Appx. 852 (6th

Cir. 2011), in which the Sixth Circuit specifically held that the fact that the

"decision on disability is reserved to the Commission" is not a "good reason" to

discount an opinion of disability from a treating doctor under 20 C.F.R.

§ 404.1527(d) (citing *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004)).

The Sixth Circuit's opinion in *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d

646, 652 (6th Cir. 2011) involved a case where a consultative psychiatrist's

opinion contradicted the opinion of the treating physician, a pain specialist.  The

contradiction was resolved in favor of the treating physician on the ground that the

treating doctor was a pain specialist, who had seen the claimant 22 times over 2

years, and had done an EMG.  Here, since Dr. Kimpson, who is also a  treating

physician and pain specialist, meets the requirements of 20 C.F.R.

§ 404.1527(d)(2), plaintiff maintains that his opinion should have been given

controlling weight.  Plaintiff maintains that *Johnson* repudiates the ALJ's refusal

to give appropriate weight to opinion evidence of a pain specialist based on a

rationale that the physician's opinion was not based on any "physical findings on

examination, and rather only documented[ed] the subjective complaints of the

claimant."  She contends that *Johnson* also rejects the significant weight the ALJ

granted to the opinion of the non-examining DDS physician.  *Id*. at 649.  *Johnson*

holds that rejecting the pain specialist's opinion for lack of "objective" findings is

"clearly erroneous."  *Id*.  Thus, according to plaintiff, the ALJ erred by: (1) failing

to give the pain specialist's opinion greater weight than a non-specialist's opinion; and (2) failing to appreciate that when a doctor is a "pain specialist" the complaints regarding pain from a patient are expected to be subjective in nature. *Id*. at 652.  Plaintiff submits that *Johnson's* holding applies directly to this case with even greater force today, than as previously noted by this Court since the Commissioner has had three chances to apply the treating physician rule properly and has failed on each occasion.

On the other hand, the Commissioner maintains that the ALJ did give a "good reason" for discounting Dr. Kimpson's conclusory opinions when he pointed out that the opinions invaded the Commissioner's exclusive responsibility to decide the ultimate issue of disability, and then cited other substantial evidence, including Dr. Kimpson's own progress notes, to support a finding that plaintiff could do a range of sedentary work.   (Tr. 649-50).  *See Kidd v. Comm'r of Soc. Sec.*, 283 Fed. Appx. 336, 341-42 (6th Cir. 2008); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010) ("[T]he procedural protections at the heart of the ['good reasons'] rule may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.").

The Commissioner also asserts that plaintiff's reliance on *Kalmbach v.*

29

*Comm'r of Soc. Sec*., 409 Fed. Appx. 852 (6th Cir. 2011), is misplaced.  In

*Kalmbach*, the ALJ discounted a treating source's opinion in part because "[the

determination of disability] is a conclusion reserved to the Commissioner."  *Id*. at

861. The Sixth Circuit explained that this rationale "did not supply the ALJ with a

legitimate basis to disregard the physicians', and particularly Dr. Ognenovski's,

assessment of Kalmbach's abilities to perform work-related activities, including

standing, walking, sitting, using her hands, and so forth."  *Id*.  In other words, Dr.

Ognenovski had proffered specific work-related limitations; "[he] did not opine in

a vacuum that Kalmbach was disabled."  *Id*.  Conversely here, Dr. Kimpson did

not provide a function-by-function assessment of plaintiff's ability to perform

work-related activities.  Rather, he did "opine in a vacuum that [she] was

disabled."  (Tr. 631, 1115).  Therefore, the ALJ was not required to provide any

explanation beyond pointing out the obvious—that Dr. Kimpson's conclusory

statements add little to the disability calculus because they were not expressed in

specific functional terms, and therefore were not particularly helpful in evaluating

plaintiff's RFC.  *See Engebrecht*, 572 Fed. Appx. at 399.

The Commissioner's argument regarding Dr. Kimpson's conclusory

opinions is correct.  Dr. Kimpson's "opinions" were not so clearly "medical

opinions" as that term is used in the regulations, or of a nature that the ALJ was

required to give them controlling weight or even subject them to the good reasons

analysis. The ALJ must consider all <u>medical opinions</u> that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The applicable regulations define medical opinions as "statements from physicians ... that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Dr. Kimpson opined that plaintiff was unable to work since December 2004 and that she was permanently disabled. Announcing that plaintiff is permanently disabled with unnamed restrictions, lacking any explanation as to how that conclusion translates in terms of a functional analysis, essentially amounts to an opinion on a matter reserved to the Commissioner (i.e., disability) and does not meaningfully inform the ALJ as to plaintiff's impairments or resulting limitations and restrictions. Thus, Dr. Kimpson's statement is not properly characterized as a medical opinion; and accordingly, the ALJ was not required to give it controlling weight or subject it to a good reasons analysis. *See e.g.*, *Riggs v. Comm'r of Soc. Sec.*, 2016 WL 3437537, at *4 (W.D. Mich. June 23, 2016) (Opinion that plaintiff was disabled and unable to work is not a medical opinion); *West v. Astrue*, 2011 WL 825791, at *8 (E.D. Tenn. Jan. 19, 2011) ("[I]t was reasonable for the ALJ to omit discussion of Dr. Coffey's opinion because it was not a 'medical opinion' as defined by 20 C.F.R. § 416.927(a)(2)."); *Koller v. Astrue*, 2011 WL 5301569, at *5 (E.D. Ky.

Nov. 3, 2011) (finding that the ALJ is not required to defer to statements by physicians concerning matters reserved to the Commissioner).

The undersigned also agrees with the Commissioner that plaintiff's reliance on *Kalmbach* is misplaced. As that Court observed, the inclusion of an opinion regarding issues reserved to the Commissioner does not undermine or provide a reason to discount otherwise properly supported medical opinion(s) contained in the same record. Here, however, Dr. Kimpson did not offer any medical opinions that can be considered separately from his opinion that plaintiff is "permanently disabled." Thus, *Kalmbach* is inapposite. And, the *Johnson* case does not save Dr. Kimpson's opinion. In *Johnson*, the pain specialist offered opinions regarding plaintiff's functional limitations and those opinions were found to be supported by objective medical evidence in the record, contrary to the ALJ's conclusions in that case. Here, Dr. Kimpson's opinions are easily distinguished from those offered by the pain specialist in *Johnson* because Dr. Kimpson did not offer any opinions that qualify as "medical opinions" and did not offer any opinions regarding plaintiff's functional limitations. Thus, the undersigned finds no error in the assessment of Dr. Kimpson's opinions.

(c).    Dr. Soo/Dr. White

The ALJ issued two assessments of Dr. Soo's and Dr. White's opinions. In her analysis of the Listing, the ALJ made the following assessment:

32

> In June 2005, Michael White, M.D., issued a medical
> source statement opining the claimant could not perform
> lifting over 5 pounds. She could never perform bending
> or twisting. She could not stand for more than 30
> minutes at a time. (Ex. 1F/5). In October 2006, Teck
> Mun Soo, M.D., issued a medical source statement
> opining the claimant could lift up to 25 pounds (Ex.
> 1F/43, 4F/38). In February 2007, Dr. Soo issued a
> medical source statement opining the claimant would be
> totally disabled from July 2006 through January 2007.
> He opined when she returned to work she could never
> lift over 10 pounds. She could sit for 30 minutes. She
> could never bend or stoop. (Ex. 4F/35). The undersigned
> accords little weight to Dr. White's and Dr. Soo's
> restrictions issued regarding the claimant's functioning
> between October 2004 through September 2007 because
> the undersigned finds the claimant met listing 1.04(A)
> during that period.

(Tr. 648). The ALJ then considered these opinions, as well as later opinions from

Dr. White, in assessing plaintiff's limitations and RFC for the period after

September 1, 2007. (Tr. 649-650). The ALJ refers to Dr. Soo's opinion, noting

that in October 2006, Dr. Soo issued a medical source statement opining that

claimant could lift up to 25 pounds. (Tr. 649, citing Tr. 323, Tr. 492). In February

2007, Dr. Soo issued a medical source statement opining that claimant would be

totally disabled from July 2006 through January 2007. He also opined that once

she did return to work she could never lift over 10 pounds, she could sit for 30

minutes and she could never bend or stoop. (Tr. 649, citing Tr. 489). ALJ Guyton

gave partial weight to Dr. Soo's recommendation for a sedentary lifting level. (Tr.

649).  However, in terms of plaintiff's functioning after September 2007, the ALJ

gave little weight to Dr. Soo's remaining restrictions because the limitations were

deemed excessive in light of the medical record that shows a stable lumbar fusion

at L5-S1, including the normal gait, excellent hand grip strength, full motor

strength, and negative muscle atrophy on exam.  (Tr. 649).

In June 2005, Michael White, M.D., issued a medical source statement

opining plaintiff could not perform lifting over 5 pounds, she could never perform

bending or twisting, and she could not stand for more than 30 minutes at a time.

(Tr. 649, citing Tr. 285).  The ALJ assigned this opinion little weight in terms of

plaintiff's functioning after September 2007, because the limitations were deemed

excessive in light of the medical record that shows a stable lumbar fusion at

L5-S1, including the normal gait, excellent hand grip strength, full motor strength,

and negative muscle atrophy on exam.  (Tr. 648, 649).

In December 2008, Dr. White issued a medical source statement opining the

claimant could not stand, walk, or sit for longer than 15 minutes at a time.  (Tr.

650, citing Tr. 604).  The ALJ gave this opinion partial weight in terms of Dr.

White's recommendation for not standing, walking, or sitting for longer than 15

minutes at a time.  However, the ALJ also concluded that, based on the treatment

records indicating plaintiff's continuing complaints of back pain, after September

2007, plaintiff would be further limited to sedentary work; occasionally stooping,

crouching, balancing or climbing ramps or stairs; never crawling, kneeling, or

climbing ladders, ropes, or scaffolds; requiring a handheld assistive device for

prolonged ambulation or on uneven terrain; an avoidance of hazardous machinery,

unprotected heights, and fast moving hazards.  (Tr. 650).

Plaintiff objects to the ALJ's assessment of the treating physician opinions

and weight given to Dr. Montasir's evaluation.  According to plaintiff, the ALJ

rejected treating source opinions by Dr. Soo and Dr. White during the time she

finds that plaintiff met Listing 1.04(A), because they are unnecessary to that

conclusion.  (Tr. 648).  She also rejected these same sources out-of-hand after

September 1, 2007, because they are "excessive" in light of the consultative

examiner's report by Dr. Montasir.  Plaintiff contends that the ALJ's evaluation of

plaintiff's credibility, as well as the weight assigned to treating source opinions, is

entirely based on a single examination by Dr. Montasir.  Indeed, based on Dr.

Montasir's report, plaintiff's complaints were deemed not credible and the treating

physicians' restrictions were deemed "excessive."  According to plaintiff,

regarding the ALJ's assessment of her credibility, plaintiff's reports of symptoms

pre-dating her examination by Dr. Montasir are credible as to their intensity,

persistence, and limiting effects (Tr. 647); yet the same testimony after September

1, 2007, is not credible because it is inconsistent with the "objective evidence"

provided by Dr. Montasir (Tr. 649).  Plaintiff challenges the ALJ's analysis

because it rests primarily on a blanket statement that the limitations imposed are "excessive," without further discussion.  According to plaintiff, the ALJ cherry-picks not only the treating physicians' findings, but even Dr. Montasir's findings, to support her determination that plaintiff could perform work at the sedentary level after 9/1/07.

Per the ALJ, the primary indicia of plaintiff's ability to perform sedentary work after 9/1/07 are plaintiff's steady gait and good leg strength, as Dr. Montasir noted.  (Tr. 649).  To buttress this determination, the ALJ cites Dr. Emmer's evaluation of plaintiff's gait and lower extremity strength.  (Tr. 600).  Yet, according to plaintiff, the ALJ ignores the neurologist's other significant findings of diminished vibratory sense on the entire right side, including the right leg.  She also ignores Dr. Emmer's concluding impression that plaintiff's complaints of chronic back and lower right leg pain and numbness were "most likely" caused by chronic lumbar radiculopathy, that may be the result of "failed back syndrome." (Tr. 600).  Furthermore, the ALJ did not mention Dr. Emmer's later report, following a repeat MRI (Tr. 602), that showed scar tissue and degenerative changes with disc bulges in the lower spine (Tr. 605).  Dr. Emmer stated that plaintiff's chronic low back pain was due to this scar tissue and these degenerative changes.  *Id*.

To support the same conclusion (steady gait, good strength), the ALJ

references (Tr. 649) a few pages from Dr. Kimpson's voluminous medical chart

(Tr. 614 – exam 2/17/11; 615 – exam 1/20/11; 617 – exam 11/16/10; 618 – exam

10/18/10).  Yet, plaintiff contends that the ALJ overlooks the fact that on each of

these dates, plaintiff also had a positive straight leg raise bilaterally.  Additionally,

plaintiff says that the ALJ disregards the fact that both Dr. Emmer and Dr.

Kimpson arrived at the same diagnosis (chronic lumbar radiculopathy) that is

consistent with the reported symptoms.  In addition, Dr. Montasir had other

objective findings that the ALJ does not consider.   For example, plaintiff could

not heel/toe walk.  (Tr. 588). Her gait was stable but slow; squat was only to 40%;

forward bending was limited to 75% with lumbosacral pain; straight-leg raise was

positive bilaterally at 60 degrees recumbent and 40 degrees sitting; impression was

osteoarthritis and spinal disorder.   (Tr. 584).  Plaintiff also points out that none of

the physicians who have examined her, not Dr. White, Dr. Soo, Dr. Kimpson nor

Dr. Montasir, have questioned the credibility of her complaints.  Thus, the treating

physicians' opinions are uncontradicted and, according to plaintiff, there is no

contravening substantial evidence suggesting plaintiff can successfully perform

work at the sedentary level.

In contrast, the Commissioner maintains that the ALJ appropriately

considered the opinions of Dr. Soo and Dr. White.  The Commissioner rejects

plaintiff's claim that Dr. Kimpson's declaration of "total" disability is

uncontradicted and consistent with the opinions of other treating and examining physicians.  For instance, Dr. Soo opined that plaintiff could return to work in February 2007, with the following restrictions: no lifting over 10 pounds, no bending/stooping, and sitting and walking "as tolerated."  (Tr. 488-89).  Thus, the Commissioner points out that Dr. Soo believed that plaintiff could go back to work in a limited capacity, whereas Dr. Kimpson believed that she could not. Apart from the restrictions on bending/stooping and sitting/walking only "as tolerated" (Tr. 649), the Commissioner maintains that Dr. Soo's opinion supports the ALJ's decision, rather than Dr. Kimpson's, although the Commissioner acknowledges that some of Dr. Soo's limitations were not included in the RFC. (Dkt. 17, Pg ID 1249, n. 9).

In March 2007, Dr. White opined that plaintiff was limited to "no lifting, pushing, pulling over 5 lbs.," and "no standing or prolong[ed] sitting 1-2 hrs per day" through July 30, 2007.  (Tr. 314).  Later, in June 2008, he limited plaintiff to no lifting, pushing, or pulling over 10 pounds, and "no prolonged walking no more [sic] than 1-2 hours out of the day."  (Tr. 571).  In December 2008, he opined that plaintiff could not stand, walk, or sit for longer than 15 minutes at a time.  (Tr. 604).  According to the Commissioner, Dr. White's two most-recent opinions are entirely consistent with the ALJ's RFC assessment.  (Tr. 649-50).

The Commissioner also points out that Dr. Montasir's September 2007

report supports the ALJ's decision.  Although he did not explicitly state that

plaintiff was not disabled, he did find that she had no motor or reflex deficits, no

muscle atrophy, a normal gait, and satisfactory range of motion in all joints, and

also opined that she could perform every function he evaluated except stooping,

squatting, and heel/toe walking.  (Tr. 583-84, 587-88).  Consequently, the

Commissioner argues that the ALJ did not need a medical license to deduce that

those relatively mild findings did not support a finding of total disability.  *See Poe*

*v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("[A]n ALJ does

not improperly assume the role of a medical expert by assessing the medical and

non-medical evidence before rendering a[n RFC] finding."); *Brown v. Comm'r of*

*Soc. Sec.*, 2015 WL 1431521, at *7 (W.D. Mich. Mar. 27, 2015) (an ALJ does not

"play doctor" by identifying inconsistencies among medical records, testimony,

and other evidence).

Plaintiff is correct that in summarily dismissing Dr. Soo's and Dr. White's

opinions as "excessive" (as applied to the period after September 1, 2007), the

ALJ neglected to adhere to the two-pronged analysis required to comply with the

treating source rule.  However, in the view of the undersigned, any error by ALJ

Guyton in not properly analyzing the treating physician opinions of Dr. Soo and

Dr. White under *Gayheart* is harmless because the RFC that the ALJ ultimately

assessed is consistent with those opinions.  *See Wilson v. Comm'r of Soc. Sec.*, 378

F.3d 541, 547-48 (6th Cir. 2004) ("Despite his failure to address the treating

physician's opinion, the ALJ in Heston had considered the limitations described

by that physician …. There was no reason to remand the case because, wittingly or

not, the ALJ attributed to the claimant limitations consistent with those identified

by the treating physician.") (discussing *Heston v. Comm'r of Soc. Sec*., 245 F.3d

528 (6th Cir. 2001)).

First, the ALJ specifically questioned the vocational expert as to whether

she could perform any jobs if she could only sit, stand or walk for 15 minutes at a

time, and the VE responded affirmatively.  (Tr. 721-722).  Thus, this limitation

imposed by Dr. White is accommodated in the RFC.  *See* Social Security Ruling

(SSR) 83-12 (Unskilled work typically is not structured to accommodate a

sit/stand option at will; thus a VE should be consulted to clarify the implications

for the occupational base.).

Additionally, Dr. Soo and Dr. Montasir found that plaintiff could never fully

stoop, a limitation not accommodated by the ALJ's RFC as she found that plaintiff

could occasionally stoop.  As set forth in SSR 96-9p, an inability to stoop

significantly erodes the sedentary occupational base:

> An ability to stoop occasionally; i.e., from very little up
> to one-third of the time, is required in most unskilled
> sedentary occupations.  A complete inability to stoop
> would significantly erode the unskilled sedentary
> occupational base and a finding that the individual is

disabled would usually apply, but restriction to
occasional stooping should, by itself, only minimally
erode the unskilled occupational base of sedentary work.

Nevertheless, as the Commissioner correctly points out, none of the jobs identified

by the vocational expert that someone with plaintiff's RFC could perform involve

any stooping.  *See* Dictionary of Occupational Titles § 205.367-030, 1991 WL

686074; § 237.367-046, 1991 WL 672194; § 379.367-010, 1991 WL 673244.

Therefore, the exclusion of this limitation results in no prejudice.

Finally, Dr. White's limitation on no prolonged standing or walking for

more than 1-2 hours per day is fully accommodated by the sedentary classification.

*Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 162, 172 (6th Cir. 2016) (A

"sedentary" range is generally associated with sitting for about six hours in an

eight-hour workday.) (citing SSR 96-9p, 1996 WL 374185, at *3 (S.S.A. July 2,

1996) (noting that in a  sedentary range "[s]itting would generally total about 6

hours of an 8-hour workday"); *see also Mager v. Comm'r of Soc. Sec.*, 145 F.3d

1332, at *2 n. 2 (6th Cir. 1998) (table).   Based on the foregoing, the undersigned

finds no restrictions imposed by Dr. Soo and Dr. White that are inconsistent with

the ALJ's RFC.  Thus, any error in weighing or assessing their opinions is

harmless.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED**, that the Commissioner's motion for summary judgment be **DENIED**, that the findings of the Commissioner be **REVERSED**, and that continuing benefits be **AWARDED** to plaintiff.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date: September 14, 2017          s/Stephanie Dawkins Davis
                                  Stephanie Dawkins Davis
                                  United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on September 14, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                  s/Tammy Hallwood
                                  Case Manager
                                  (810) 341-7887
                                  tammy_hallwood@mied.uscourts.gov